PITTMAN, Judge.
Scott Holston (“the husband”) and Le-cresha Holston (“the wife”) were married in December 2001. The marriage was the second one for both parties; the wife was 28 years old and the husband was 37 years old when they married. One week before the marriage, the parties executed an antenuptial agreement that, by its terms, is to be governed by the laws of Mississippi. The parties attached to the agreement handwritten statements outlining their ma *739 jor assets and liabilities. Those statements indicate that the wife’s net worth was $2,000 and the husband’s net worth was $1.7 million.
The husband is a pharmacist. When the parties married, the husband had an ownership interest in two closely held corporations: S <& S Pharmacy, Inc., doing business as The Medicine Shoppe, and Holmac, Inc., doing business as Rx Express Pharmacy. He also owned a sole proprietorship, The Uniform Shoppe, and several parcels of real property in Alabama and Mississippi, including two commercial lots in Pascagoula, Mississippi.
After the marriage, the parties (and the wife’s three daughters from her previous marriage) lived in the husband’s residence in Grand Bay. Two sons were born of the parties’ marriage. After the birth of the parties’ second son in 2004, the husband sold the Grand Bay residence and the parties purchased a house in the Muir Woods subdivision of Mobile. The wife was employed outside the home only sporadically during the parties’ seven-year marriage, and, when she was employed, she worked at The Uniform Shoppe. The husband was paid twice a month; he deposited his paycheck of approximately $2,300 from The Medicine Shoppe into the parties’ joint checking account. The wife used the funds in that account to pay the family’s routine monthly expenses. The husband also had an individual checking account, into which he deposited his earnings and bonuses from other business entities. The husband used the funds in his individual account to purchase real and personal property, to invest in new businesses and stocks, and to pay family expenses.
During the marriage, the husband used $60,000 from his individual account to purchase a lot adjacent to his two existing commercial lots in Pascagoula. In September 2007, he sold the three-lot parcel for $700,000. In order to avoid paying capital-gains tax on the sale of the lots and to receive favorable tax treatment pursuant to 26 U.S.C. § 1031, the husband formed a separate business entity, Holston Timbers, LLC, that purchased four parcels of property in Mississippi.[1] Holston Timbers subsequently purchased two additional parcels of land in Mississippi. The total purchase price for the six parcels was $846,458.72.
The husband also acquired an interest in two additional pharmacies during the marriage — Rx Express of Navarre, Inc., and Rx Express of Bayou La Batre, Inc. — and purchased stock in two Pascagoula banks. He bought 783 shares of Merchants & Marine Bank stock for $31,320, using funds from his individual checking account. The stock certificates were issued in the husband’s name, payable to the wife upon his death. The husband bought 25,000 shares of Charter Bank stock for $250,000, with funds borrowed from his Medicine Shoppe account. The husband explained how he purchased the Charter Bank stock as follows: “When I wrote the check out of Medicine Shop [sic] to purchase the stock, that’s the way I do loans to my [individual] account. And then, as I draw bonuses [from The Medicine Shoppe], I have to pay taxes on the bonus money I get. And whatever the net is, I apply it back to the loan, back to [The Medicine Shoppe].” The Charter Bank stock certificates were issued to the parties as joint tenants with right of survivorship. The husband also *740 created an E-Trade account in the parties’ joint names.
The parties filed joint federal and state income-tax returns during the marriage. For the four years preceding the trial of this case, those returns showed adjusted gross incomes of $593,211 for 2006; $813,272 for 2007; $1,093,250 for 2008; and $940,149 for 2009.
In January 2009, the wife filed a complaint for a divorce, seeking custody of the parties’ sons, child support, periodic alimony, alimony in gross, an equitable division of the property acquired during the marriage, and an attorney fee. The husband answered the complaint, asserting that the wife was precluded by the antenuptial agreement from receiving periodic alimony, alimony in gross, Or a division of the property that he had acquired during the marriage. The husband also counterclaimed, seeking a divorce and custody of the parties’ sons.
At trial in July 2010, the parties stipulated that the antenuptial agreement was valid, and the trial court stated that it would enforce the agreement. The agreement provides, in pertinent part:
“4.
“The parties agree that except as may be otherwise expressly set forth in this agreement, all property, real and personal, owned by either of them at the time of their contemplated marriage, from whatever source, shall remain the respective property of the person in whose name it stands, and neither shall acquire any interest in or right to any of the property of the other.
“A.
“If the parties shall be married, the right with respect to the property owned by either of them at the time of the contemplated marriage or acquired during their marriage shall be subject to the terms of this agreement....
“B.
“[A]ll properties of any name or nature, real, personal, or mixed, wherever they may be found, belonging to [the husband] before marriage, or those which may be acquired or accumulated after such marriage, by purchase, trade, gift, or otherwise, shall be and remain forever his personal estate, and this shall include all interests, rents, dividends, profits, and other appreciated value which may in time accrue, or result in any manner from increase in value, or be collected for the use of the properties in any way.
“C.
[Section C is identical in all respects to section B, but it is applicable to properties belonging to the wife.]
“D.
“It is further agreed that [the husband] and [the wife] do mutually waive and release to each other, and to their heirs at law, devisees, legatees, successors and assigns, all claims of dower, courtesy, widow’s allowances, forced shares, all rights of support and all claims as heirs at law of each other in and to their respective properties mentioned above. Each party shall hold all real property and personal property which he or she now owns or may hereafter acquire free from any claim of dower, inchoate or otherwise, and this contract shall evidence the right of [the husband] to convey any of his real estate free from any such claims of dower. At the request of [the husband], [the wife] shall execute, acknowledge, and deliver such other instruments as may be reasonably required to accomplish the transfer by [the husband] of any of his real property free from any such claim of dower or to divest any claim of dower *741 in such property. It is also expressly understood and agree[d] that in the event of the death of [the husband] or in the event of separation or dissolution of the marriage, [the wife] shall in consideration therefor, receive certain payments as herein described.
“E.
“It is further agreed that nothing herein shall be construed to be a bar to either party giving any property of which he or she may be possessed to the other party by will or otherwise. It is understood that each party to this contract shall control his or her own personal estate, as described herein, and do with the properties whatsoever he or she wishes and wills, by his or her orders or directions, or by a testament, the same as either could or would do if no marriage relations existed between them.
“F.
“If the parties separate or the marriage is dissolved, each party waives, releases, and relinquishes the other from any duty or obligation to support the other in any fashion or manner whatsoever, including temporary and permanent separate maintenance, temporary alimony, permanent lump-sum, periodic, or rehabilitative alimony, or any other form of alimony or support, which duty or obligation may otherwise arise but for this agreement, and no claim or demand for such support shall be made at any time or under any circumstances. The parties specifically express and acknowledge their understanding that each party’s own separate property and the provisions relative to equitable distribution, as hereinafter set forth, are sufficiently adequate to enable each party to provide for his or her own support in the event of a separation or dissolution of marriage. Nothing contained herein shall be construed to suggest that either party expects, in the event of the parties’] separation or dissolution of marriage, to continue or anticipates a standard of living or lifestyle commensurate with that which was enjoyed prior to or during the parties’ marriage.
[[Image here]]
“H.
“In the event of a dissolution of marriage, regardless of which party is at fault or initiates the dissolution action, [the wife] shall receive the sum of $10,000 for each year or portion of a year of the marriage. Payment of the lump sum shall be in cash payable as follows: 1) $5,000 payable within 60 days of the date that either party files for dissolution; and 2) the balance within 30 days of the entry of a final judgment of divorce. It is the intent of the parties that the payments set forth herein shall fully satisfy all alimonial obligations of [the husband], said obligations to include temporary and permanent separate maintenance, temporary alimony, permanent lump-sum, periodic or rehabilitative alimony, or any other form of alimony or support.”
The parties presented evidence indicating that the following assets had been acquired during the marriage:
[[Image here]]
*742 [[Image here]]
On August 19, 2010, the trial court purported to enter a judgment that, among other things, (a) awarded each party the property that he or she had owned before the marriage or had inherited, (b) awarded the husband the four business entities that he had acquired or formed during the marriage; (c) awarded the wife $95,500 for her interest in the marital residence and $520,000 as a “property settlement”; (d) awarded each party half the stock in Merchants & Marine Bank, Charter Bank, and the E-Trade account; awarded the wife three automobiles; and awarded the husband three automobiles, two trucks, two tractors, a bulldozer, and two all-terrain vehicles. The trial court ordered the parties to make two lists of the furniture and household furnishings that had been acquired during the marriage, instructing the husband to choose which list represented the items he wanted the court to award him, leaving the items identified on the second list for the wife. The husband appealed, and this court dismissed the appeal on March 6, 2012, on the basis that the appeal had been taken from a nonfinal order, citing Sims v. Sims, 38 So.3d 71, 72 (Ala.Civ.App.2009). Holston v. Holston (No. 2100359, March 6, 2012), - So.3d -(Ala.Civ.App.2012) (table).
On May 3, 2012, the trial court entered a final judgment, awarding the furniture and household furnishings and leaving intact all other provisions of its August 19, 2010, order. Following the denial of his post-judgment motion on July 6, 2012, the husband filed a timely notice of appeal on August 17, 2012.
It is undisputed that, following the entry of the trial court’s August 19, 2010, order, the husband paid the wife $95,500, representing half the equity in the marital residence; $95,000, representing the payments owed to the wife pursuant to section H of the antenuptial agreement; and $35,000, representing half the E-Trade account. The husband raises a single issue on appeal: whether the trial court violated the antenuptial agreement and erred in awarding the wife a property settlement of $520,000.

Standard of Review

Because the parties’ antenuptial agreement states that it is governed by the law of Mississippi, our review of the trial court’s judgment is governed by the substantive law of Mississippi, not Alabama. “However, standards of appellate review are procedural in nature and the law of the forum controls.” Bates v. Bates, 103 So.3d 836, 841 (Ala.Civ.App.2012).
Under Mississippi law, “ ‘[a]n antenuptial contract is as enforceable as any other contract. Accordingly, the same rules of interpretation apply.’ ” Doster v. Doster, 853 So.2d 147, 150 (Miss.Ct.App.2003) (quoting McCord v. Spradling, 830 So.2d 1188, 1204 (Miss.2002) (citations omitted)).
“The first rule of contract interpretation is to give effect to the intent of the parties. Sumter Lumber Co. v. Skipper, 183 Miss. 595, 608, 184 So. 296, 298 (1938). More correctly stated, our concern is not nearly so much what the parties may have intended as it is with *743 what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy. Id.”
Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss.1988).
The parties stipulated that the antenuptial agreement was valid and enforceable. The sole issue on appeal, therefore, is whether the trial court correctly interpreted the agreement. “ ‘The interpretation of a provision in an antenuptial agreement, like the interpretation of any provision in any contract, is a question of law for the trial court.’ ” Hood v. Hood, 72 So.3d 666, 676 (Ala.Civ.App.2011) (quoting Peden v. Peden, 972 So.2d 106, 110 (Ala.Civ.App.2007), citing in turn Laney v. Laney, 833 So.2d 644, 646 (Ala.Civ.App.2002)).
“‘To determine whether the ante-nuptial agreement is ambiguous, the trial court was required to review the agreement to determine if “ ‘the intent of the parties c[ould] be fairly and reasonably gleaned from the four corners of the document.’ ” Stacey v. Saunders, 437 So.2d 1230, 1234 (Ala.1983) (quoting Schmidt v. Ladner Constr. Co., 370 So.2d 970, 972 (Ala.1979))....
[[Image here]]
“Peden v. Peden, 972 So.2d 106, 110 (Ala.Civ.App.2007).
“ ‘An agreement that by its terms is plain and free from ambiguity must be enforced as written. Jones v. Jones, 722 So.2d 768 (Ala.Civ.App.1998). An ambiguity exists if the agreement is susceptible to more than one meaning. Vainrib v. Downey, 565 So.2d 647 (Aa.Civ.App.1990). However, if only one reasonable meaning clearly emerges, then the agreement is unambiguous. Id. Finally, if a provision of an agreement is certain and clear, it is the duty of the trial court to determine its meaning, and the court’s determination is afforded a heavy presumption of correctness and will not be disturbed unless it is clearly erroneous. Id.’
“R.G. v. G.G., 771 So.2d 490, 494 (Ala.Civ.App.2000).
“Furthermore, Alabama appellate courts have stated that a court will not look beyond the four corners of a written instrument unless the instrument contains latent ambiguities.’ Judge v. Judge, 14 So.3d 162, 165 (Ala.Civ.App.2009).”
Hood v. Hood, 72 So.3d at 676-77. “If a contract can be interpreted without going beyond the four corners of the document, the trial court’s resolution of the question of law is accorded no presumption of correctness, and this Court’s review is de novo.” Exxon Mobil Corp. v. Alabama Dep’t of Conservation & Natural Res., 986 So.2d 1093, 1101 (Ala.2007) (citing Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003)).

Discussion

The husband contends that the trial court’s $520,000 property-settlement award to the wife is inconsistent with the express terms of the antenuptial agreement. He maintains that, because the wife was awarded half of all jointly held assets acquired during the marriage — i.e., half of Subtotal B in the chart, supra, or $217,-160 — and because there are no other assets that were acquired during the marriage that do not belong solely to the wife or solely to him from which the property settlement could have been derived, the property settlement must have been derived from his separate estate.
The wife maintains that the ante-nuptial agreement fails to address the divi *744 sion of property acquired with “jointly earned funds” during the marriage. She argues that, because the parties filed joint federal and state income-tax returns during the marriage, all the income they reported must be deemed “jointly earned.” Although the appellate courts of Mississippi and Alabama do not appear to have addressed that issue, the Court of Appeals of Tennessee recently surveyed the applicable law and determined that “the filing of a joint tax return does not, ipso facto, result in transmutation of separate property into marital.” Estate of Hunt v. Hunt, 389 S.W.3d 755, 762 (Tenn.Ct.App.2012). The Tennessee court explained:
“[T]he Internal Revenue Code, 26 U.S.C.A. § 6013 (2003) ... provides, in relevant part, as follows:
“ ‘(a) Joint returns. — A husband and wife may make a single return jointly of income taxes under subtitle A, even though one of the spouses has neither gross income nor deductions, except as provided below: ... ’
“In J.R. Kemper, Annotation, Right of Surviving Spouse to Tax Refund Resulting from Joint Income Tax Return, 67 A.L.R.3d 1038 (1975), Mr. Kemper discusses the purpose of 26 U.S.C.A. § 6013 as follows:
“ ‘As has been noted by the courts in several cases, § 6013(a) of the Internal Revenue Code of 1954, which authorizes a husband and wife to file a joint federal income tax return even though one of them had no income of his or her own, was enacted in order to put taxpayers throughout the country on an equal basis by permitting couples in common-law states to split income between themselves and thus to diminish their tax liability in the same manner as couples were able to do in community property states wherein each spouse was deemed entitled to one — half of all income irrespective of the amount earned by or accruing to each. [McClure v. United States, 228 F.2d 322 (4th Cir.1955); Bertucci v. United States, 146 F.Supp. 949 (1957) ].
“ ‘On the other hand, it has also been generally recognized that Congress did not intend § 6013(a) to affect or change the ownership of property rights between taxpayers, and that as a consequence the filing of a joint federal income tax return does not automatically convert the interest of one spouse in any refund due thereunder into a joint interest therein with his or her marital partner. [In re Wetteroff, 453 F.2d 544 (8th Cir.1972), perm. app. denied 409 U.S. 934, 93 S.Ct. 242, 34 L.Ed.2d 188 (1972), reh. den. 409 U.S. 1050, 93 S.Ct. 532, 34 L.Ed.2d 503 (1972) (citing In re Illingworth, 51 Am. Fed. Tax R. 1512, 56-2 USTC ¶ 10004 (D.C.Or.1956)) (“The Government in making a tax refund makes no attempt to determine what part of such refund should belong to the recipients to decide how such refund shall be divided or used.”) ].’
“The majority of caselaw from our sister states holds that the filing of a joint tax return does not, ipso facto, result in transmutation of separate property into marital.”
Estate of Hunt v. Hunt, 389 S.W.3d at 761-62. We adopt the reasoning of the Tennessee Court of Appeals in Hunt and conclude that the parties’ filing of joint income-tax returns during the marriage did not convert the husband’s separate property into marital property.
The wife next contends that section 4 and section B of the antenuptial agreement are ambiguous and that the trial court implicitly determined that those sections pertain only to property owned at *745 the time of the marriage and not to later-acquired property. The wife did not argue in the trial court that any portion of the agreement was ambiguous, and the plain language of section 4 and section B, as well as section A, demonstrates no ambiguity. Section 4 states:
“The parties agree that except as may be otherwise expressly set forth in this agreement, all property, real and personal, owned by either of them at the time of their contemplated marriage, from whatever source, shall remain the respective property of the person in whose name it stands, and neither shall acquire any interest in or right to any of the property of the other.”
(Emphasis added.) More specifically, section A states:
“If the parties shall be married, the right with respect to the property owned by either of them at the time of the contemplated marriage or acquired during their marriage shall be subject to the terms of this agreement....”
(Emphasis added.) Likewise, section B states:
“[A]ll properties of any name or nature, real, personal, or mixed, wherever they may be found, belonging to [the husband] before marriage, or those which may be acquired or accumulated after such marriage, by purchase, trade, gift, or otherwise, shall be and remain forever his personal estate, and this shall include all interests, rents, dividends, profits, and other appreciated value which may in time accrue, or result in any manner from increase in value, or be collected for the use of the properties in any way.”
The intent of the parties can reasonably be gleaned from a reading of sections 4, A, and B of the agreement. Section 4 and section B, when read together with section A, are not susceptible to more than one meaning but, rather, state in clear and unambiguous language that property “owned by” or “belonging to” either party before the marriage or acquired or accumulated by either party during the marriage remains the separate property of that party.
The wife next argues, citing Drumright v. Drumright, 812 So.2d 1021 (Miss.Ct.App.2001), that property acquired during the marriage and used for the common benefit of the parties became “marital property” subject to equitable division. It is true that in Drumright the Court of Appeals of Mississippi stated: “[M]arital property can be defined as that which was acquired during the course of the marriage. Also, property brought into the marriage by one partner and used by the family becomes a marital asset, losing its identity as a separate estate.” 812 So.2d at 1025 (citations omitted).
Under Mississippi law, “[t]he mere fact that an asset is acquired during the marriage does not immutably characterize it as marital.... [I]f the acquisition is made through the use of non-marital assets, that acquisition remains separate property.” Hankins v. Hankins 866 So.2d 508, 512 (Miss.Ct.App.2004). Moreover, the law stated in Drumright is inapplicable here because Drumright did not involve an antenuptial agreement that expressed the parties’ contrary intent. “[N]on-marital assets may be converted into marital assets if they are commingled with marital assets or used for familial purposes, absent an agreement to the contrary.” A & L, Inc. v. Grantham, 747 So.2d 832, 838 (Miss.1999) (emphasis added).
In Mabus v. Mabus, 890 So.2d 806 (Miss.2003), the Supreme Court of Mississippi considered whether the wife was entitled to a share of the property separately acquired by the husband during the mar *746 riage. The antenuptial agreement in Maims provided:
“ ‘This agreement is intended to cover and apply to all property now owned by each party and to all property which each may acquire in his or her sole and separate right, and to any property acquired by an exchange, lease, mortgage or otherwise, to any property vesting by purchase, reinvestment, substitution, increase, descent, gift, bequest, or devise, and to proceeds derived from any sale. The agreement does not apply to property as to which title is taken after their marriage in the names of both parties as joint tenants or tenants by the entirety.’”
890 So.2d at 823 (emphasis added). The Supreme Court of Mississippi, noting the trial court’s finding that the parties in Mabus had “ ‘meticulously maintained separate accounts for their premarital separate property and for the gifts and inheritances that they each received during the marriage,’ ” upheld the trial court’s determination that the wife was not entitled to a share of property separately acquired by the husband during the marriage. Id. Accord Mallen v. Mallen, 280 Ga. 43, 43, 622 S.E.2d 812, 814 (2005) (affirming a trial court’s determination that the husband “was entitled to all the assets with which he entered the marriage and all assets accumulated during the marriage” pursuant to a prenuptial agreement providing that, “in the event of a divorce, [wjife would receive a basic alimony amount to be adjusted for the number of years of marriage, and assets would belong to whomever owned the property originally or received it during the marriage”); Bennett v. Bennett, 103 A.D.3d 825, 825, 960 N.Y.S.2d 179, 180 (2013) (upholding a prenuptial agreement defining “marital property” as “ ‘(a) any property that is jointly owned by the parties, and (b) all household furniture and furnishings owned by either party, whether heretofore or hereafter acquired and regardless of the form in which title is held,’ ” and defining all other property as “ ‘separate property,’ including real property purchased by either party during the marriage using their own separate property, as well as the appreciation of such property during the marriage”). See also Long v. Long, 928 So.2d 1001, 1002 (Miss.Ct.App.2006) (reversing a trial court’s order that awarded wife a portion of the increase in the value of husband’s business and home and holding that trial court had erroneously failed to enforce antenuptial agreement whereby “ ‘[ejach of the parties expressly waive[d] any and all rights or interest which he/she may hereafter be entitled, as wife or husband, in and to any property, real or personal, which the parties now own separately’ ”).
In the present case, the properties from which the valuations in Subtotal A of the chart, supra, are derived — Rx Express of Navarre, Inc.; Rx Express of Bayou La Batre, Inc.; Holmac Properties, Inc.; Holston Timber, LLC; and the rental property in Pascagoula — were acquired by the husband from funds in his individual or business accounts and kept separate from the funds in the joint account to which the wife had access during the marriage. The parties’ antenuptial agreement provides no method by which those properties separately acquired by the husband during the marriage could become marital property.
Finally, the wife argues that, although she agreed to waive her right to any form of alimony, pursuant to sections F and H of the antenuptial agreement, she did not relinquish her right to an equitable division of the property acquired during the marriage, and, she insists, the ante-nuptial agreement did not prohibit the trial court from awarding her a “property settlement.” In consideration of the pay *747 ments set out in section H — $10,000 for each year or portion of a year of the marriage — the wife agreed, in section F, to release the husband from
“any duty or obligation to support [her] in any fashion or manner whatsoever, including temporary and permanent separate maintenance, temporary alimony, permanent lump-sum, periodic, or rehabilitative alimony, or any other form of alimony or support, which duty or obligation may otherwise arise but for this agreement.”
(Emphasis added.) If our previous discussion has not already made it clear that the wife was awarded half of all jointly held, or “marital,” property and that the parties’ antenuptial agreement bars any division of the husband’s separate property, an analysis of Mississippi law relating to “lump-sum alimony” removes any doubt that section F also specifically precludes the $520,000 “property settlement” to the wife.
“Mississippi recognizes four different types of alimony: 1) periodic, 2) lump sum, 3) rehabilitative, and 4) reimbursement.” Smith v. Little, 834 So.2d 54, 57 (Miss.Ct.App.2002). Mississippi principles of law pertaining to alimony of the first, third, and fourth types identified in Smith are comparable to, if not precisely congruent with, those of Alabama law pertaining to periodic alimony. See Guy v. Guy, 736 So.2d 1042, 1046 (Miss.1999); Hubbard v. Hubbard, 656 So.2d 124, 130 (Miss.1995); and Wray v. Wray, 394 So.2d 1341, 1344 (Miss.1981).
The second type of alimony — lump sum — merits additional discussion because, although it is functionally identical to alimony in gross as known to Alabama practitioners, and Mississippi cases use the terms “lump sum alimony” and “alimony in gross” interchangeably, see, e.g., McDonald v. McDonald, 683 So.2d 929, 933 (Miss.1996); Hubbard v. Hubbard, 656 So.2d at 130; Bowe v. Bowe, 557 So.2d 793, 794 (Miss.1990); Holleman v. Holleman, 527 So.2d 90, 92 (Miss.1988), abrogated on other grounds, Smith v. Smith, 607 So.2d 122 (Miss.1992); Wray v. Wray, 394 So.2d at 1345 (quoting 24 Am.Jur.2d Divorce and Separation § 614 at 735-36 (1966)); and Miller v. Miller, 874 So.2d 469, 474 (Miss.Ct.App.2004), lump-sum alimony has a special history in Mississippi.
Until 1994, when Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994), was decided, Mississippi “adhered to a system of returning property to the spouse in whom title was held (separate property method).” Ferguson v. Ferguson, 639 So.2d 921, 925 (Miss.1994). Before 1994, “Mississippi [was] the only state in the Union that continue[d] to adhere to the title theory in property distribution in a divorce case. 22 Fam. L.Q. 367, 393-394 (1989). See also Crafts v. Morgan, 776 P.2d 1049, 1053 n. 4 (Alaska 1989).” Draper v. Draper, 627 So.2d 302, 305 n. 2 (Miss.1993).
In Hemsley, the Supreme Court of Mississippi abandoned the “separate property” method and adopted the method of equitable distribution, stating that “[a] spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other may claim an equitable interest in such jointly accumulated property.” Hemsley, 639 So.2d at 913.
In Ferguson, supra, the Supreme Court of Mississippi observed that the “separate property system [had] at times resulted in unjust distributions, especially involving cases of a traditional family where most property was titled in the husband, leaving a traditional housewife and mother with nothing but a claim for alimony, which often proved unenforceable.” Ferguson, 639 So.2d at 926. But, as the court explained,
*748 “to some extent, ease law ha[d] helped lessen the unfairness to a traditional housewife in the division of marital property. ...
“... [TJhis Court has allowed lump sum alimony as an adjustment to property division to prevent unfair division. The lump sum award has been described as a method of dividing property under the guise of alimony.”
Id. (emphasis added; citations omitted).
A pre-Hemsley decision explained the rationale for lump-sum alimony as a way to ameliorate the harshness of the separate-property rule.
“While lump sum alimony is in a sense an award to a wife of a portion of her husband’s estate, this Court has consistently made the distinction between divesting a husband of his property and vesting it in the wife, and lump sum alimony. We have always held that in the absence of a resulting or constructive trust the wife’s services as a housewife or a farm wife without more did not authorize a court in a divorce action to give her an equitable interest in his property. The authority of courts in a divorce to transfer property of either spouse to the other is purely statutory, and in the absence of statutory authority a court has no power to deal with vested property rights....
“On the other hand, we have long since recognized the discretionary authority of the chancery court to award lump sum alimony.
“ ‘ “... It [lump sum] is a settlement between the husband and the wife as to the interest of the latter in his property, and as to the extent of the husband’s duty to contribute to her maintenance and support.” [Guess v. Smith, 100 Miss. 457, 56 So. 166, 167 (1911).]
“ ‘The solution of the question of whether or not an allowance of a gross sum should be made must be determined by the facts of the particular case, having due regard to the best interest of the parties and the husband’s financial ability to respond to an award in gross. Where the husband’s estate is sufficient to enable him to respond to an award in gross, it will often be conducive to the welfare and happiness of both parties to end the relation of debtor and creditor between them by making such an award, and thereby relieve the wife of further dependence upon the continued solvency of the husband and his financial ability to pay a periodical stipend and his continued response to such forced contributions without future legal steps to enforce them.’
“Miller v. Miller, 173 Miss. 44, 64, 159 So. 112, 119-20 (1935).”
Retzer v. Retzer, 578 So.2d 580, 590-91 (Miss.1990) (emphasis added).
As the foregoing Mississippi authorities demonstrate, the wife, by relinquishing her right to receive “lump-sum alimony” in section F of the antenuptial agreement, did, in fact, relinquish the right to a division of the property acquired during the marriage. The Alabama trial court had no authority to disregard the antenup-tial agreement and to ameliorate, via the mechanism of a “property settlement,” any perceived harshness resulting from the wife’s waiver of “alimony in any form” because, under Mississippi law, lump-sum alimony is the functional equivalent of a property settlement. The trial court erred as a matter of law in awarding the wife any “property settlement,” much less a property settlement of $520,000, which amounts to 37.5 percent of the husband’s separate property acquired during the marriage. See Richardson v. Richardson, *749 912 So.2d 1079, 1082 (Miss.Ct.App.2005) (holding that the trial court “committed manifest error by substituting its judgment for that of a valid and enforceable contractual agreement between the parties” when it awarded wife nearly half the value of specific assets acquired during the marriage in disregard of antenuptial agreement calling for husband to take 2/3, and wife to take 1/3, of property acquired during the marriage).

Conclusion

The husband has already paid the wife $225,500: $95,500, representing half the equity in the marital residence; plus $95,000, representing the payments owed to the wife pursuant to section H of the antenuptial agreement; plus $35,000, representing half the value of the E-Trade account. Because the husband does not contest on appeal the trial court’s award to the wife of half the bank stocks, the wife is due to receive, instead of $520,000, only $140,660 more: $15,660, representing half the value of the Merchants & Marine Bank stock; plus $125,000, representing half the value of the Charter Bank stock. The judgment of the Mobile Circuit Court is reversed, and the cause is remanded with instructions to enter a judgment that conforms to the principles outlined herein.
REVERSED AND REMANDED.
THOMPSON, P.J., and THOMAS, MOORE, and DONALDSON, JJ., concur.

. 26 U.S.C. § 1031(a)(1) provides that “[n]o gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.”